**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Robert Williamson, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| v. | ) | |
| | ) | |
| Chad Pringle, JRCC Warden et al., | ) | Case No.: 1:24-cv-00069 |
| | ) | |
| Defendants. | ) | |

Presently before the court is a *Motion for Summary Judgment* (Doc. No. 106) made by Defendants James River Correctional Center ("JRCC") Warden Chad Pringle, Department of Corrections and Rehabilitation ("DOCR") Warden Joseph Joyce, Chief of Security Jeff Lorenz, JRCC Lieutenant Logan Onstad, JRCC Correction Officers Robert Dickenson, Lyle Mee, James Taylor, Zach Bell, JRCC Corrections Officers A, B, C, D, E, JRCC Administration Vickie Steckler, JRCC Investigation Captain Byran Dreher, DOCR Unit Manager Lacey Fisher, Corrections Officer FNU Living-Good, DOCR Warden James Sayler, DOCR Mail Clerk Tammy Homan, Steve Foster, and Ed LNU. For the reasons articulated below, the motion (Doc. No. 106) is granted.

## I.    BACKGROUND

Plaintiff Robert Williamson ("Plaintiff") initiated the above-captioned action on April 29, 2024, through the filing of a Prisoner Litigation Packet pursuant to the Prison Litigation Reform Act ("PLRA"). (Doc. No. 1). The initial packet was received incomplete, with Plaintiff submitting a completed packet on May 20, 2024. (Doc. Nos. 1, 3).

On July 9, 2024, the court issued a screening order directing Plaintiff to file an amended complaint or to show cause by August 9, 2024. (Doc. No. 9). On July 30, 2024, Plaintiff filed a second PLRA packet with his Amended Complaint. (Doc. No. 10).

The court reviewed Plaintiff's Amended Complaint, and on November 25, 2024, directed the Clerk's Office to serve the Amended Complaint.[1] (Doc. No. 13).  Defendants filed an Answer to the Amended Complaint on February 18, 2025. (Doc. No. 60).

On March 16, 2026, Defendants filed the instant *Motion for Summary Judgment*. (Doc. No. 106). Plaintiff filed a response on March 30, 2026, and Defendants replied on April 9, 2026. (Doc. Nos. 115, 116). The final pretrial conference and jury trial were subsequently canceled and trial preparation deadlines stayed pending a ruling on the motion. (Doc. No. 119). This matter is now ripe for the court's review.

## II.    LEGAL STANDARD

Summary judgment is dictated by Federal Rules of Civil Procedure 56. Pursuant to Rule 56, "a party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* As to whether facts are material, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine," if the evidence is enough that a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

---

[1] The court dismissed the State of North Dakota and claims for money damages against the Defendants in their official capacities. Plaintiff was permitted to proceed with ten claims as outlined in the Order. All other claims and Defendants JRCC Case Manager Frank Holdburg, DOCR Sergeant FNU Volk, Correctional Officer FNU Steckler, DOCR Case Manager Steve Bement, DOCR Investigation Captain Marc Schwehr, and DOCR Chief of Security Todd Flanagan were dismissed without prejudice. (*See generally* Doc. No. 13). The court also dismissed individual capacity claims against Director Dave Krabbenhoft, Director Colby Braun, and Brandi Netolicky. (*See* Doc. No. 9).

Once the moving party has demonstrated a sufficient showing, the burden rests on the nonmoving party to provide specific facts, whether through affidavits or other evidence, that there is a genuine issue of material facts. *Hill v. Payne*, No. 621CV06029SOHBAB, 2023 WL 2192961, at *4 (W.D. Ark Jan. 30, 2023), *report and recommendation adopted*, No. 6:21-CV-06029, 2023 WL 2192247 (W.D. Ark. Feb. 23, 2023); *see National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The nonmoving party may not rely only on allegations or denials but must provide specific facts showing there is a genuine issue for trial. *Twardowski v. Bismarck Police Dep't*, No. 1:17-CV-110, 2017 WL 8791103, at *2 (D.N.D. Dec. 22, 2017), *aff'd*, 754 F. App'x 492 (8th Cir. 2019).

While unrepresented litigants are entitled to liberal construction of the pleadings, they are required to comply with substantive and procedural law, including the requirements of Rule 56. *Glaum v. Braun*, No. 1:24-CV-146, 2026 WL 883451, at *2 (D.N.D. Mar. 31, 2026) (collecting cases).

## III.    DISCUSSION

Defendants' arguments are two-fold. Defendants first argue they are entitled to summary judgment on Claims 1, 2, 4, and 5, because Plaintiff failed to exhaust his available administrative remedies as required by the PLRA. Defendants next argue they are entitled to summary judgment on the merits of the remaining claims. In response, Plaintiff argues he is excused from exhausting administrative remedies because prison officials refused to respond to or lost his grievances, and there are genuine issues of material fact.

### A.  Failure to Exhaust Available Administrative Remedies as to Claims 1, 2, 4, and 5

The PLRA requires prisoners to exhaust their administrative remedies prior to bringing suit pursuant to 42 U.S.C. § 1983 or any other federal law. 42 U.S.C. § 1997e(a). Exhaustion of

remedies is a mandatory requirement; however, while a prisoner must exhaust available remedies, they need not exhaust those that are unavailable. *Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019); *see also Ross v. Blake*, 578 U.S. 632, 643-44 (2016) (identifying the circumstances in which an administrative remedy is unavailable). All that is required to properly exhaust one's administrative remedies is compliance with a prison's grievance procedures. *Jones v. Bock*, 549 U.S. 910, 922-23 (2007). Section 1997e(c) also dictates when a court may dismiss an action.

> (1) The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined on any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.
>
> (2) In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.

42 U.S.C. § 1997e(c)(1)-(2).

The North Dakota Department of Corrections and Rehabilitations Resident Grievance Policy ("Grievance Policy") outlines the procedures required during the grievance[2] process. Pursuant to the Grievance Policy, an inmate may only pursue a grievance about a matter subject to the grievance procedure that affected them personally and directly within the last fifteen days. Matters subject to the grievance procedure include:

> 1. Policies, rules, and procedures enforced within the facility that directly and negatively affect the adult in custody.
>
> 2. A policy, regulation, rule, or procedure, or the lack of a policy, regulation, rule, or procedure that negatively affects the conditions of confinement within the facility. Examples of conditions of confinement include the exercise of religious beliefs; recreation; access to medical, dental, vision care and treatment; access to education programs; resident accounts; commissary; case management; food

---

[2] The Grievance Policy defines a grievance as "[a] written complaint submitted through the grievance procedure by a juvenile or adult in custody about a Department policy, condition of confinement, circumstances, action or failure to act that the juvenile or adult in custody claims to be unjust, unfair, or unlawful." (Doc. No. 108-1 at 4).

service; housing conditions; hygiene; jobs; laundry; legal access; mail and mailroom; privileges; programs; property publications; recreation; safety; sanitation; searches; staff conduct (such as failure to protect or excessive use of force); and visitation.

3. Although the department allows allegations of sexual abuse to be submitted on a grievance form for investigation, the department does not have grievance procedures to address allegations of adult in custody sexual abuse, If an allegation of sexual abuse is submitted on a grievance form, it must be removed from the grievance process and processed under the Policy 3C-04, Prison Rape Elimination Act of 2003 (PREA) as though it were submitted using another permitted method. If there are another claims included in the grievance (besides the allegation of sexual abuse or harassment), then the portion of the grievance related to those claims must be refiled under a new grievance, and the original grievance will be maintained to be processed under Policy 3C-04, Prison Rape Elimination Act of 2003 (PREA) as though it were submitted using another permitted method. **[PREA 115.52]**

4. Retaliatory actions against adults in custody for submission of a grievance procedure, participation in a grievance proceeding, or the exercise of a legal right.

(Doc. No. 108-1 at 4-5) (emphasis in original).[3]

To successfully complete the grievance procedure, the inmate must have documentation of the grievance, a documented attempt at informal resolution, two levels of documented internal resolution, and an appeal to the department director. (*Id.* at 6). The process allows only one issue per grievance form. Abuse of the grievance procedure occurs when grievances contain profanity, threats, or abusive and demeaning behavior, issues that have been previously addressed through the grievance procedure or not subject to the grievance procedure, or involve the submission of multiple frivolous grievances that are abusive, harassing, or made in bad faith about DOCR employees. (*Id.* at 6, 9).

---

[3] The Grievance Policy further identifies issues not subject to the grievance procedure. Those include processes with an established, formalized appeal or review process, actions of persons outside the jurisdiction of the facility, medical decisions by a doctor, nurse practitioner, physician's assistant, dentist, or psychologist, and housing, programs, and work assignments. (*Id.* at 5).

5

### 1.  Exclusion from Exhausting Administrative Remedies

The court first turns to whether Plaintiff was excused from exhausting his administrative remedies due to prison officials refusing to respond or losing grievances. Plaintiff appears to cite *Porter v. Sturm* in support of his argument that inmates are excused from exhausting remedies.

> Inmates are excused from exhausting remedies when officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures. A remedy that prison officials prevent a prisoner from utilizing is not an available remedy under § 1997e(a).

*Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015) (internal quotations, citations, and alterations omitted). However, Plaintiff does not show that he was excused from exhausting his administrative remedies beyond a vague assertion that "Defendants Motion for summary judgment claiming Plaintiff failed to exhaust remedies when DOCR OFFICIALS FAILED TO RESPOND, LOST GRIEVANCES AND OR DESTORED IS GOOD CAUSE FOR EXHAUSTING REMEDIES should be **DENIED**[.]" (Doc. No. 115 at 11) (errors and emphasis in original). Plaintiff provides no support for this assertion. In fact, Defendants provide evidence that Plaintiff not only knew about the grievance procedure, but used it often, with numerous responses from prison officials. *See Morris v. Allen*, No. 2:12CV00146 JLH-JJV, 2013 WL 3422893, at *3 (E.D. Ark. July 8, 2013), *aff'd* (Oct. 29, 2013) ("The failure to exhaust administrative remedies is an affirmative defense that the defendant has the burden of pleading and proving.").

### 2.  Claim 1

Plaintiff's Claim 1 asserts a lack of access to the courts pursuant to the First Amendment by DOCR Warden James Sayler ("Sayler") and DOCR Unit Manager Lacey Fisher ("Fisher"), in due their alleged refusal to fix the Wi-Fi or provide any research to Plaintiff, resulting in Plaintiff's inability to timely file an appeal from his criminal judgment.

As argued by Defendants, no grievance was submitted relating to Plaintiff's concerns with access to legal materials or to the internet that impacted his ability to appeal his criminal judgment. In reviewing Plaintiff's grievances, the court is inclined to agree. Plaintiff alleges this incident occurred on or about February 18, 2022. (*See* Doc. No. 10 at 21). However, Plaintiff did not file any grievances until August of the same year. (*See* Doc. No. 108-3 at 2). There is no record of a grievance documenting these concerns until March 7, 2024, when Plaintiff submitted loose-leaf documents that he considered "Appeal Step 2," wherein he claimed to be giving the DOCR an opportunity to respond to alleged non-answered grievances. (Doc. No. 108-37 at 3, 30). This "Appeal Step 2" does not document either Sayler or Fisher as the individuals allegedly involved in the incident beyond a general assertion that Plaintiff wrote to the unit manager and warden. (*Id.* at 30). The DOCR responded to Plaintiff on April 18, 2024, advising that not only had the facility just responded to several other grievance appeals, but Plaintiff did not follow the correct process or use the correct form to appeal, and to the extent Plaintiff meant to file the documents as sensitive in nature,[4] they did not meet the criteria. (*Id.* at 2).

Because Plaintiff did not file a grievance pertaining to the lack of access to legal materials or access to the internet that impacted his ability to appeal, did not tie Sayler and/or Fisher to the allegations in Claim 1, and failed to file a grievance within the required fifteen day window, Plaintiff has failed to exhaust his administrative remedies as required by the PLRA. Thus, summary judgment is required as to Claim 1.

---

[4] The Grievance Policy defines when a grievance is sensitive in nature. "If an adult in custody has a sensitive complaint and reasonably fears possible adverse effects if the adult in custody's complaints are known at the facility, the adult in custody may file a grievance directly with the department director through the mail. The adult in custody is required to clearly explain the reason for not submitting the grievance through the facility's grievance process. If the DOCR director determines the grievance is not of a sensitive nature, the grievance will be returned to the adult in custody to file through the usual grievance procedures." (Doc. No. 108-1 at 8-9).

### 3. Claim 2

Plaintiff alleges lack of access to the courts under the First Amendment against JRCC Administration Vickie Steckler ("Stecker"), Ed LNU, and DOCR Mail Clerk Tammy Homan ("Homan") on the basis that in approximately May 2023, he sent out a Rule 24 letter to the State Attorney's Office and the letter was returned to him on July 27, 2023. (Doc. No. 10 at 27). He further alleges that he did not receive the Rule 24 letter back until April 7, 2024, and was therefore unable to have his claims reviewed for ineffective assistance of counsel which in turn impacted his release date. (*Id.*).

Defendants again argue Plaintiff did not exhaust his administrative remedies prior to the filing of the complaint as no grievance was filed.

> A review of the grievances submitted by Plaintiff during his term of incarceration establish that of the 50 grievances filed, Plaintiff filed five grievances related to his issues with mail and staff handling of mail procedures …. A review of each of the five grievances submitted that address mail or staff handling of mail irrefutably demonstrates that Plaintiff did not file a grievance alleging any of the underlying facts that are now claimed and were allowed to proceed after screening by this Court.

(Doc. No. 107 at 13). The court agrees that none of the grievances pertaining to mail or staff handling of mail relates to the instant claim. Each of the five grievances either do not name Steckler, Homan, or Ed LNU, do not fall within the fifteen-day window, or are factually unrelated to the instant claim. Accordingly, Plaintiff has failed to exhaust his administrative remedies as to Claim 2.

### 4. Claims 4 and 5

Claims 4 and 5 address substantially similar facts. Both claims allege JRCC Correction Officer Zach Bell ("Bell") violated Plaintiff's First and Eighth Amendment rights by labeling him as a snitch to other inmates, and that JRCC Warden Chad Pringle ("Pringle"), Chief of Security Jeff Lorenz ("Lorenz"), and JRCC Investigation Captain Bryan Dreher ("Dreher") were

8

deliberately indifferent to Bell's actions and failed to intervene or protect Plaintiff. (Doc No. 10 at 21, 23).

Plaintiff submitted multiple grievances pertaining to Bell, but the grievances did not pertain to him being labeled as a snitch. In May 2023, Plaintiff filed a grievance requesting he be given additional good time because Bell deprived him of his rights, while also threatening an eye for an eye action. (Doc. No. 108-9 at 2). Another grievance was filed in August 2023, pertaining to an alleged write-up by Bell. (Doc. No. 108-10 at 2-3).

Although Plaintiff did not specifically file any grievances pertaining to Bell calling him a snitch, he did submit snitch-related grievances. However, he only mentioned DOCR staff as a whole. (Doc. No. 108-34 at 3; Doc. No. 108-38 at 2-5). In response, even though Plaintiff alleged fears for his safety, DOCR reported that Plaintiff refused to participate in the separation process, in other words, to request administrative segregation. (Doc. No. 108-38 at 2).

The only mention of Bell purportedly calling Plaintiff a snitch is on loose-leaf documentation submitted to Director Colby Braun, wherein Plaintiff asserted, "Officer Zach Bell is telling inmates that I am snitching on them, this needs to stop…. Officer Bell is putting me in danger, also putting my family in danger. I'm getting strong armed over this." (Doc. No. 108-37 at 20). The documents were subsequently returned due to failure to follow the correct process and failure to use the correct appeal form. (*Id.* at 2).

Similar issues arise as to Plaintiff's claim against Pringle, Lorenz, and Dreher for their alleged deliberate indifference and failure to intervene or protect Plaintiff from Bell. There are no grievances alleging that these individuals were deliberately indifferent to Bell's actions or that they knew the alleged conduct was occurring and failed to intervene. The only mention of potential deliberate indifference as to Plaintiff being labeled a snitch is in a November 2024 grievance,

9

where Plaintiff asserted the DOCR in general was deliberately indifferent to his health and safety. (Doc. No. 108-38 at 3).

Even if the court were to construe Plaintiff's grievances as having been against Bell, Pringle, Lorenz, and Dreher, Plaintiff still would not have complied with the Grievance Policy. The alleged conduct occurred in July 2022, and Plaintiff's grievances and loose-leaf documents were not submitted until 2024. This is well over the 15-day deadline required by the Grievance Policy. The claims against Bell, Pringle, Lorenz, and Dreher are therefore subject to summary judgment for failure to exhaust administrative remedies.

### B. Summary Judgment as to Claims 3, 6, 7, 8, 9, and 10

Defendants also argue they are entitled to summary judgment as to the merits of Claims 3, 6, 7, 8, 9, and 10.

#### 1. Claim 3

Plaintiff alleges in Claim 3 that between December 2023 and July 2024, Homan, Warden Joseph Joyce ("Joyce"), Fisher, and DOCR Mail Clerk Steve Foster ("Foster") ignored his requests to improve the filing system by adopting Odyssey, requiring him to submit documents by mail. "Because of the delay, motions are not accepted and I'm also not notified until after I've had a hearing. If I'm not notified in time for a hearing, I can't address the issues on record for a review of abuse of discretion and I lose that right." (Doc. No. 10 at 27).

Plaintiff filed a grievance in August 2024, pertaining to issues with the legal mail process. (*See* Doc. No. 108-35). In his first grievance, Plaintiff "demanded" a no contact order due to fear of staff and not wanting to either be in contact with or see staff. (Doc. No. 108-33 at 5). His proposed remedy was for facility staff to bring him his legal mail and to be provided with a tablet for his court hearings. (*Id.*). In a second grievance, Plaintiff alleged that his legal mail was

interfered with and requested to open mail with another shift. (Doc. No. 108-51 at 2). This request was accommodated. (*Id.*). In a third grievance, Plaintiff voiced continued concern with the mail system, alleging that the facility "use's our legal mail process to violate our 1st Amendment by putting refused on the mail when request to do it with another shift." (Doc. No. 108-35 at 5). Plaintiff also requested the facility adopt the Odyssey system or come up with a new system. (*Id.* at 3-5). Plaintiff received accommodation to receive his legal mail from a different shift, but appealed, again requesting the Odyssey system be implemented. (*Id.* at 2).

A prisoner retains the right to send and receive mail under the First Amendment, but this right may be restricted by prison regulations that are reasonably related to legitimate interests. *Glaum v. Braun*, No. 1:24-CV-146, 2026 WL 883451, at *2 (D.N.D. Mar. 31, 2026). Greater protections have been afforded to legal mail and outgoing mail than to non-legal mail and incoming mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). An isolated incident of mail tampering is not enough to establish a violation, rather, the inmate must make a showing that prison officials engaged in regular and unjustifiable interference with incoming legal mail. *Id.*

Even taking Plaintiff's allegations as true, a reasonable jury could not conclude a violation of his First Amendment occurred. First, Plaintiff cannot show there was regular and unjustifiable interference with his mail. Due to an alleged fear for his safety, Plaintiff did not want contact with the staff who open and copy legal mail for the inmates, and instead wanted his legal mail brought to him and to attend court hearings by tablet. However, pursuant to policy, staff will not deliver legal mail, and inmates are required to sign for mail and be present when the documents are copied. Even when accommodation was made for Plaintiff to have another shift handle his legal mail, Plaintiff continued to try to waive his rights to be present for the opening of legal mail and continued advocating for the adoption of Odyssey. (*See* Doc. No. 108-33 at 3; Doc. No. 108-35 at

11

2). To the extent Plaintiff may argue that "putting refused" on the mail violates his First Amendment rights, Plaintiff was advised that staff were following the correct procedure by documenting his refusals to engage in the legal mail process. (Doc. No. 108-35 at 5).

At most, the closest Plaintiff comes to arguing that prison officials engaged in regular and unjustifiable interference with incoming legal mail is his statement that due to mail delays his motions were not accepted by the court and he did not receive notice of this until after court hearings. (*See* Doc. No. 10 at 27). Here again, even construing this information in a light most favorable to Plaintiff, the facts do not demonstrate that a reasonable jury could find a First Amendment violation occurred. While Plaintiff alleged an injury, he does not show how prison officials engaged in regular and unjustifiable interference with his mail beyond this single incident. *See Sanderson v. Lopez*, No. 4:17CV00174 JLH/PSH, 2017 WL 4020428, at *2 (E.D. Ark. Aug. 21, 2017), r*eport and recommendation adopted*, No. 4:17CV00174 JLH-PSH, 2017 WL 4012963 (E.D. Ark. Sept. 12, 2017) ("Neither an isolated incidence of mail tampering nor short delays in receiving mail violate a prisoner's First Amendment right to free speech to send and receive mail.").

Finally, to the extent Plaintiff argues Homan, Joyce, Fisher, and Foster are liable under Section 1983 for violating his constitutional right to access the mail, Plaintiff has failed to state a claim for which relief can be granted. Section 1983 requires defendants to be held liable for their own specific conduct which must rise to the level of a constitutional violation. Plaintiff is required to allege facts showing each defendant was involved in the alleged violation, and the facts must explain how each defendant was involved or responsible for the deprivation of a constitutional right. *Glaum v. Braun*, No. 1:24-CV-146, 2025 WL 1067441, at *11 (D.N.D. Apr. 9, 2025), *on*

12

*reconsideration in part*, No. 1:24-CV-146, 2025 WL 1864884 (D.N.D. June 2, 2025). "General references to defendants collectively are insufficient to allege individual liability." *Id.*

In Plaintiff's complaint, he does not specifically allege how each listed Defendant violated his First Amendment right to access the mail. Instead, Plaintiff generally claims the free flow of his mail was interrupted and the failure to adopt Odyssey is grossly negligent. (*See* Doc. No. 10 at 55). This is not remedied in Plaintiff's opposition to summary judgment. In his responsive brief, Plaintiff continues to group the Defendants together generally. (*See* Doc. No. 115 at 11 ("Because *the defendants* in this action refused Williamson access to the courts in order to file and follow proper rules of procedure that would have produced a different result.") (emphasis added)). To the extent Plaintiff does address each Defendant individually, he still does not point to how each individual Defendant was involved in the deprivation of his rights, beyond his vague statement that the free flow of his mail has been interrupted by the NDSP mail process, resulting in missed hearings, rejected and denied motions, undelivered subpoenas, and missed scheduling notices. (Doc. No. 115 at 13). Plaintiff's failure to comply with the requirements of Section 1983 entitle the Defendants to qualified immunity and dismissal. *See Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." (internal quotations and citations omitted)).

### 2. Claim 6

The sixth claim alleges that on approximately August 15, 2023, Pringle and Lorenz retaliated against Plaintiff for filing three grievances by making a false conduct report, which resulted in him being transferred to a maximum-security prison.

The Eighth Circuit has outlined the applicable law required to succeed on a retaliatory transfer claim.

> In general, a prisoner enjoys no constitutionally protected right against transfer to another prison. And '[j]ust as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State." Prison authorities have a great deal of discretion in running their institutions, and such discretion normally outweighs any interest that any individual prisoner may have in remaining housed in a particular prison. Nevertheless, a prisoner cannot be transferred in retaliation for his exercise of constitutionally protected rights, either between prisons in a single state, or between state and federal prison systems under the interstate Corrections Compact.

> To successfully argue retaliatory transfer in violation of his constitutional rights pursuant to § 1983, [Plaintiff] "must prove that a desire to retaliate was the actual motivating factor behind the transfer." In other words, [Plaintiff] must prove that but for his protected First Amendment activity, he would not have been transferred.

*Rouse v. Benson*, 193 F.3d 936, 940 (8th Cir. 1999) (internal citations omitted).  As such, Plaintiff is required to prove that but for his First Amendment conduct, he would not have been transferred.

The record shows Plaintiff made numerous threats during his incarceration, not only to Bell, but to other staff as well. Plaintiff's grievances are jam-packed with threats to facility staff. (*See* Doc. No. 108-9 at 2 ("Give me good-time for CIT since your staff member deprived me of the rights thats under law, and the kindness of my heart I will forget eye for an eye for the good-time I've lost for CIT. Or I got plan B, get write ups and loose good-time or plan C eye for any eye, that a possible trip back to prison or jail." (errors in original)); Doc. No. 108-12 at 4 ("God made it simple, eye for an eye love a brother threw the treatment given to you, repay." (error in original)); Doc. No. 108-24 at 4 ("She's lucky I didn't throw something at her for trying to trip me 'cutting me off, stepping in front of me.' She's got an attitude, she keeps it up I'll keep rolling the dice back. Respect for respect." (error in original))). Moreover, the declarations and emails provided by Defendants show that the transfer was not due to grievances, but rather to ensure the safety and security of Bell and the staff because of Plaintiff's threats. At no time during the email

correspondence were the grievances discussed. Conversations instead focused on a memorandum submitted by Bell in regard to fears for his safety, and whether Plaintiff should be moved. Also notable is Defendants' concern as to whether and to what extent any potential opportunity for treatment may be impacted if he were to be transferred. Taken in totality, Defendants had justification for transferring Plaintiff due to his behaviors and threats toward facility staff.[5]

Based on the information available in the record, no reasonable jury could conclude that the filing of grievances was the but for cause of Plaintiff's transfer. For these reasons, Defendants are entitled to summary judgment with respect to the retaliatory transfer claim.

### 3. Claims 7, 8, and 9

Plaintiff contends that in mid-2023, JRCC Lieutenant Logan Onstad ("Onstad"), JRCC Correction Officers Robert Dickenson ("Dickenson"), Lyle Mee ("Mee"), James Taylor ("Taylor"), and multiple unnamed officers violated his Eighth and Fourteenth Amendment rights by using excessive force against him. (Doc. No. 10 at 23-24). Plaintiff further alleged claims against Onstad, Lorenz, Taylor, Mee, and unnamed officers for failure to intervene or protect Plaintiff from Dickenson's use of force.

Plaintiff's grievances from this incident allege that while investigating his black eye, staff members assaulted him.

> I feared for my safety, they kneed, kicked, bashed my head, twisted my knees. When I was in a cell I continued to get kicked. The COS was bashing his knee in my back, I have a bad back, while they was striping me while pulling my underwear off somebody's finger went in my asshole. Staff had no reason to pull me off the floor. They had no reason to use force.

---

[5] Of note, while Lorenz is listed as a Defendant in this claim, Lorenz had no role in the decision to transfer Plaintiff. Email correspondence suggests the JRCC Warden and Deputy Warden made the decision to transfer Plaintiff after a memorandum was submitted by Bell detailing concerns for his safety.

(Doc. No. 108-11 at 5) (error in original). After reviewing video footage of the incident, staff concluded Plaintiff was restrained due to noncompliance with officer commands, at no time did an officer knee or harm him in any way outside the "force continuum," and no officer was seen putting a finger in his anus. (*Id.*). Plaintiff disagreed with the findings filed a step two grievance. (*Id.* at 4). Plaintiff appealed the step two grievance and on review, the grievance appeal was denied. (*Id.* at 2-3). The denial concluded: "The video footage of the incident was reviewed and showed that staff followed policy and training guidelines…. A review of the Use of Force report shows the staff followed all appropriate amount of force in this situation when you failed to comply with staff directives." (*Id.* at 2).

The standard for reviewing an excessive force claim under the Eighth Amendment is well established in this circuit.

> The Eighth Amendment's cruel and unusual punishment clause governs a convicted prisoner's right to be free from the use of excessive force. After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. When confronted with a claim of excessive force alleging a violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Factors that inform this inquire are: (1) whether there was an objective need for force, (2) the relationship between any such need and the amount of force used, (3) the threat reasonably perceived by the correctional officers, (4) any efforts by the officers to temper the severity of their forceful response, and (5) the extent of the inmate's injury.

*Ashton v. Moire*, No. 1:24-CV-193, 2024 WL 5248000, at *2 (D.N.D. Dec. 11, 2024), *report and recommendation adopted*, No. 1:24-CV-00193, 2024 WL 5245882 (D.N.D. Dec. 30, 2024) (internal citations and quotations omitted). While the Eighth Amendment protects a prisoner against excessive use of force, it does not protect a prisoner against objectively *de minimis* use of force. *Smith v. Mensinger*, 293 F.3d 641, 648 (3d. Cir. 2002).

Here, the material facts included in the video footage, grievances, and other relevant evidence demonstrate that Defendants applied reasonable force to maintain or restore discipline.

16

During the investigation into Plaintiff's black eye, Plaintiff refused to turn around for hand restraints to be applied. Only after his continued non-compliance with verbal commands and attempts to pull away was force used. This force included taking Plaintiff to the ground and securing his hands and feet while waiting for a drag blanket to be brought by staff to transport Plaintiff based on his refusal to walk. Based on the available evidence, a reasonable jury could not conclude that the force used constituted excessive force in violation of the Eighth Amendment. Moreover, to the extent Plaintiff continues to argue excessive force was used, the Eighth Amendment does not protect against the use of *de minimis* force, as is the case here.

Plaintiff also cannot establish personal liability under Section 1983. While Dickenson and Mees used force to bring Plaintiff to the ground, there is no evidence that the use of this *de minimis* force was intended for anything other than to secure Plaintiff after his continued disregard of verbal commands and attempts to resist staff. Further, there is no evidence that Onstad, Lorenz, or Taylor engaged in personal acts violating Plaintiff's constitutional rights. Evidence of such *de minimis* use of force is not sufficient to overcome Defendants' entitlement to qualified immunity.

Dickenson is also entitled to summary judgment as no reasonable jury could find that the video footage demonstrates he kicked Plaintiff in the head three times while he was in a drag blanket as Plaintiff alleged. The footage further shows that at no time during the incident was Plaintiff either purposefully kicked or kicked at all.

Similarly, because the video footage shows that at no time did Dickenson, or any other officer, kick Plaintiff in the head, Plaintiff cannot succeed on his failure to intervene or to protect claim against Onstad, Lorenz, Taylor, Mee, and the unknown officers. "A prison official may be liable for failure to protect an inmate from a use of excessive force if he is deliberately indifferent to a substantial risk of serious harm to an inmate." *Ashton,* 2024 WL 5248000, at *3 (quoting

17

*Estate of Davis Ostenfeld v. Delo*, 115 F.3d 1388, 1395 (8th Cir. 1997)). "A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault." *Id.* (quoting *Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir. 1994)). Because the video evidence shows that at no time was Plaintiff kicked, Defendants cannot be said to have failed to intervene or to protect Plaintiff as there was no use of excessive force for the Defendants to respond to. *See Smith,* 293 F.3d at 650-51 ("[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." However, "an officer is only liable if there is a realistic and reasonable opportunity to intervene.").

Finally, Lorenz is entitled to summary judgment. To overcome qualified immunity and to hold Lorenz personally liable under Section 1983, the alleged conduct must be specific and supported by evidence allowing a reasonable jury to find that Lorenz violated Plaintiff's constitutional rights. *See Evans as Tr. for Evans v. Krook*, 680 F. Supp.3d 1080, 1093 (D. Minn. 2023) ("[W]hen a defendant moves for summary judgment on qualified immunity grounds, the plaintiff bears the burden to present evidence from which a reasonable jury could find the defendant officer has violated the plaintiff's constitutional rights."). In his complaint, Plaintiff alleges that during the incident, Lorenz assaulted him by placing his finger in Plaintiff's anus. However, in his original grievance, Plaintiff only commented that "somebody" placed their finger in his anus. (Doc. No. 108-11 at 5). Approximately two months later and only after an officer indicated they saw no one place their finger in his anus did Plaintiff name Lorenz as the individual who allegedly assaulted him at step two of the grievance process. (*See Id.* at 4). On appeal of the step two grievance, Director Dave Krabbenhoft reiterated that at no time did anyone see an officer

18

place a finger in Plaintiff's anus, and review of the relevant video footage showed that staff followed policy and training guidelines. (*Id.* at 2). Because there is nothing to support Plaintiff's allegations beyond his vague and albeit self-serving assertion that Lorenz assaulted him, there is no evidence from which a reasonable jury could find Plaintiff's claim is supported to establish personal liability under Section 1983 or overcome Lorenz's qualified immunity. As such, Lorenz is entitled to summary judgment.

### 4. Claim 10

Finally, Plaintiff claims Corrections Officer FNU Living-Good ("Living-Good") violated his rights under the Eighth Amendment for using excessive force by placing pressure on and twisting Plaintiff's wrists when placing him in handcuffs. (Doc. No. 10 at 26). As previously explained, the Eighth Amendment prohibits excessive use of force against convicted prisoners, with unnecessary and wanton infliction of pain constituting cruel and unusual punishment. *See Ashton,* 2024 WL 5248000, at *2.

Plaintiff filed a grievance against Living-Good in October 2023. Plaintiff alleged that after telling Living-Good he was going to sue his colleagues, Living-Good began twisting his wrists in the handcuffs. (Doc. No. 108-16 at 5). Plaintiff proceeded to inform Living-Good that if he continued to twist his wrists, he was going to sue for cruel and unusual punishment and excessive force. (*Id.*). At that point, Living-Good allegedly cranked Plaintiff's wrists harder. (*Id.*). Living-Good responded in the informal resolution portion of the grievance:

> Resident Williamson, at that time of the ICS, I did slightly add pressure to your wrist because you were pulling away from your escorting officers and yelling at the surrounding staff. You were acting in a threatening way. I gave you commands to stay near. This is a technique taught in training if a resident is being disorderly and you need to gain control. I meant no disrespect or harm.

(Doc. No. 108-16 at 5). Plaintiff disagreed with the assessment of step one submitted a step two grievance on January 5, 2024. (*Id.* at 4). In step two, Plaintiff again asserted Living-Good cranked

his wrist harder after Plaintiff stated he was going to sue for violations of his Eighth Amendment rights if Living-Good continued to use excessive force. (*Id.* at 4). Plaintiff appealed the step two decision and after review, Director Colby Braun ("Braun"), denied the appeal, advising:

> The grievances and appeal were reviewed. Officer LivingGood did not use excessive force, he applied pressure when you did not follow directives, were pulling away from officers, and yelling at the surrounding team members. Once you complied with the directives given, the pressure was discontinued. Your actions during an emergency required the NDSP team to address your behavior, which resulted in you being escorted to BIU and receiving an incident report. You created an unsafe situation not only for the team members, but also the residents in that unit. Your appeal is denied.

(*Id.* at 2).

In his reply, Plaintiff argues that Living-Good's actions were not warranted because there was no yelling, threat of harm, and no one was placed in fear of being harmed. (*See* Doc. No. 115 at 24). As a result of Living-Good "cranking" his wrists while handcuffed, Plaintiff claimed he sustained a "painful permanent bubble" on his wrist that causes it to hurt or go numb. (*Id.* at 23-24). Even taking these facts in a light most favorable to Plaintiff, Plaintiff cannot establish there is a genuine issue of material fact that may result in a reasonable jury weighing in his favor.

In determining whether there is an excessive force claim under the Eighth Amendment, the court must consider five factors. *See Ashton,* 2024 WL 5248000, at *2 (The five factors include whether there was an objective need for force, relationship between such need and amount of force used, threat reasonably perceived by the officers, any efforts to temper the severity of the forceful response, and the extent of the inmate's injury). A review of the factors, the parties' briefs, and the grievances, demonstrates that Plaintiff cannot show the force was applied for any reason other than to maintain or restore discipline.

As to the first factor, Plaintiff cannot show there was not an objective need for force. It is undisputed that at or about the time Living-Good handcuffed Plaintiff, there was an ICS event that

required the participation of numerous staff members to resolve. While this event was occurring, Plaintiff engaged in disorderly behavior, which resulted in staff members being taken away from the emergency to address him. (Doc. No. 108-16 at 4; *see also* Doc. No. 111-1 at 3 ("Resident Robert Williamson…was standing in the entrance of the library yelling at Capt. Erickson and Lt. Jung as they were escorting the residents involved with the fight."); Doc. No. 111-1 at 11 ("When escorting inmates that had been fighting, inmate Williamson was standing in the library still yelling at staff, calling them super cops and other names. I stopped at the library and informed inmate Williamson that when he is asked to clear the area that is what he needs to do. He started to say something about his right[s] are being violated.")).

As to the second factor, there was a relationship between the need for force and the force actually used by Living-Good. Living-Good applied restraints as a result of Plaintiff's disorderly and non-compliant behavior, and disengaged pressure when Plaintiff complied with directives. (Doc. No. 108-16 at 4.). The third factor considers the threat reasonably perceived by the correctional officers. Here, Plaintiff cannot show the force used was disproportionate to the circumstances. As opined by Braun, "Officer Living[-]Good did not use excessive force, he applied pressure when you did not follow directives, were pulling away from officers, and yelling at the surrounding team members." (*Id.* at 2).

As to the fourth factor, which considers efforts made by the officers to temper the severity of their forceful response, Living-Good discontinued pressure as soon as Plaintiff complied. (*Id.*). Finally, the fifth factor considers Plaintiff's injury. Plaintiff alleges that because of his wrists being "yanked" or "cranked," he acquired a permanent bubble on his wrist that caused pain or numbness. There is no information to corroborate this injury beyond Plaintiff's own statements. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own

conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). At most, Plaintiff can show that he disagrees with the finding that no excessive force was used; however, such a disagreement is not enough to show that Living-Good engaged in malicious or sadistic actions to cause Plaintiff harm. Living-Good is therefore entitled to summary judgment.

## IV.    CONCLUSION

For the reasons articulated above, Defendants' *Motion for Summary Judgment* (Doc. No. 106) is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 3rd day of June, 2026.

/s/ Clare R. Hochhalter
Clare R. Hochhalter, Magistrate Judge
United States District Court